IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

TERRI KALLAIL,

       Plaintiff,

vs.

ALLIANT ENERGY CORPORATE
SERVICES, INC.,

       Defendant.

No. C10-0063

RULING ON MOTION FOR
SUMMARY JUDGMENT

_____

**TABLE OF CONTENTS**

*I.*     *INTRODUCTION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*II.*    *PROCEDURAL BACKGROUND*. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*III.*   *RELEVANT FACTS*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*IV.*   *LEGAL STANDARD FOR SUMMARY JUDGMENT*. . . . . . . . . . . . . . 10

*V.*     *DISCUSSION*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     *A.*    *Kallail's State and Federal Claims*. . . . . . . . . . . . . . . . . . . . . . . 11
     *B.*    *Analytical Framework Under the ADA*. . . . . . . . . . . . . . . . . . . . 12
     *C.*    *Does Kallail Have a Disability as Defined by the ADA?*. . . . . . . . . 15
     *D.*    *Is Kallail a "Qualified Individual" as Defined by the ADA?*. . . . . . 18

*VI.*   *ORDER*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## I. INTRODUCTION

This matter comes before the Court on the Motion for Summary Judgment (docket number 12) filed by Defendant Alliant Energy Corporate Services, Inc., on March 15, 2011; the Resistance (docket number 19) filed by Plaintiff Terri Kallail on April 12, 2011; and the Reply (docket number 27) filed by Defendant on April 22, 2011. Pursuant to Local Rule 7.c, the Motion for Summary Judgment will be decided without oral argument.

## II. PROCEDURAL BACKGROUND

Plaintiff Terri Kallail timely filed charges of disability discrimination against Defendant Alliant Energy Corporate Services, Inc., with the Iowa Civil Rights Commission ("ICRC") and the Equal Employment Opportunity Commission ("EEOC"). Both the ICRC and EEOC issued right-to-sue letters with respect to Kallail's charges of disability discrimination.

On April 7, 2010, Kallail filed a Petition at Law and Jury Demand in the Iowa District Court for Linn County (Case No. LACV68754). In her petition, Kallail alleges disability discrimination in violation of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and disability discrimination in violation of the Iowa Civil Rights Act ("ICRA"), Iowa Code Chapter 216. On April 27, 2010, Alliant filed a Notice of Removal to the United States District Court for the Northern District of Iowa. On May 12, 2010, Alliant filed an Answer, generally denying the material allegations contained in the petition, and asserting certain affirmative defenses.

On May 13, 2010, both parties consented to proceed before a United States Magistrate Judge, pursuant to the provisions set forth in 28 U.S.C. § 636(c). Trial is scheduled before the undersigned on July 25, 2011. Alliant timely filed the instant Motion for Summary Judgment on March 15, 2011.

## III. RELEVANT FACTS

Defendant Alliant Energy Corporate Services, Inc., is an Iowa Corporation headquartered in Cedar Rapids, Iowa. It is the wholly owned subsidiary of Alliant Energy Corporation. Its primary business is to provide management and administrative support to other Alliant Energy Corporation subsidiaries.

Kallail was hired by Alliant as a Customer Service Consultant in 1996. She worked at Alliant's Customer Service Center in Cedar Rapids. On October 27, 1997, Kallail was promoted to Technical Associate in the Distribution Dispatch Center ("DDC") in Cedar

Rapids.[1]  On April 26, 1998, Kallail was promoted to Associate Resource Coordinator. On July 4, 1999, Kallail was promoted to Resource Coordinator.[2]

In order to staff the DDC and provide 24-hour, seven-day-per-week coverage, Alliant requires Resource Coordinators in Cedar Rapids to work a rotating shift schedule. Resource Coordinators work in teams of two on nine week schedules that rotate between 12-hour shifts and 8-hour shifts. In the first week, Resource Coordinators work an 8-hour day shift (Monday-Thursday). The second week is also an 8-hour day shift. The third week is a five day evening shift from 2:00 p.m. to 10:00 p.m. The fourth week is an 8-hour day shift from 6:00 a.m. to 2:00 p.m. (Monday-Friday). The fifth week is also an 8-hour day shift from either 7:00 a.m. to 3:00 p.m. or 9:00 a.m. to 5:00 p.m. (Monday-Friday). The sixth week is a 12-hour shift from 6:00 p.m. to 6:00 a.m. (Monday-Thursday). The seventh week is also a 12-hour shift from 6:00 a.m. to 6:00 p.m. (Monday-Wednesday) and 6:00 p.m. to 6:00 a.m. (Friday-Sunday). The eighth week is a 12-hour shift from 6:00 a.m. to 6:00 p.m. (Thursday-Sunday). Resource Coordinators are paid for the ninth week, but are not scheduled to work.

In November 2004, Kallail requested a permanent 8-hour day shift schedule as a job accommodation for her diabetes.[3]  On November 17, 2004, Heidi Hoffland ("Hoffland"),

---

[1]  The DDC monitors the distribution of electricity, gas, and steam throughout the Interstate Power and Light Company service territory in Iowa and Minnesota. The DDC also schedules and routes resources to respond to routine and emergency situations. Alliant also has a DDC in Wisconsin which covers a different territory outside Iowa and Minnesota, and performs some different duties.

[2]  Resource Coordinators are responsible for: (1) scheduling and routing resources to respond to routine and emergency work in an efficient manner, (2) supporting field personnel during outage restoration, (3) calling service personnel out after hours for outages or emergencies, and (4) monitoring the electric, gas, and steam distribution systems.

[3]  Kallail has Type 1 diabetes and is insulin dependent. She generally tests her blood sugar 6 to 8 times per day. She has also dealt with peripheral vascular disease ("PVD"), a limitation in the circulation of blood in her legs and feet, since 1993. More recently, she

(continued...)

Senior Human Resources Generalist for Alliant, requested Kallail's physician, Dr. Melanie Stahlberg, to complete a medical certification form. On December 7, 2004, Hoffland received the completed form. Dr. Stahlberg opined that Kallail should be accommodated by working "no swing shifts, day shifts recommended." In a follow-up telephone conversation, Dr. Stahlberg told Hoffland that "'[Kallail] would benefit from working a straight day shift. Working swing shift causes erratic changes in her blood pressure, blood sugar [and] cause[s] her to be at higher risk of diabetic complications [and] overall mortality.'"[4]

In a letter dated April 12, 2005, Alliant informed Kallail that a straight eight-hour day shift schedule was not a reasonable accommodation and, therefore, her request was denied. Specifically, Alliant wrote that it:

> recently completed a thorough review of your request and based on the facts obtained we have rendered a decision that your request for a straight day shift schedule is not a reasonable accommodation under the ADA. The Resource Coordinator's essential functions require rotating shifts and emergency call ins to support daily electric and gas operations 24 hours a day 7 days a week to meet company and public safety requirements.

*See* Alliant's Appendix (docket number 12-3) at 89. As an alternative to Kallail's requested accommodation, Alliant indicated that it would consider reassigning Kallail to a vacant position with a straight 8-hour day shift schedule.

On August 9, 2005, Kallail emailed Jill Breitbach, Senior Human Resources Generalist, indicating that she would be willing to consider a different position at Alliant.[5]

---

[3] (...continued)
has developed neuropathy in her legs and feet.

[4] *See* Alliant's Appendix (docket number 12-3) at 73.

[5] Kallail also noted that she had contacted Sue Kleisch, Human Resources Compliance Manager, seeking review of the denial of her request for an accommodation, but she received no response. *See* Kallail's Appendix (docket number 19-2) at 65.

On August 11, 2005, Human Resources Compliance Manager, Sue Kleisch, emailed Kallail requesting to speak with her regarding the types of positions in which Kallail may be interested. Kallail spoke with Kleisch on August 23, 2005. In their conversation, Kleisch asked Kallail if she had any additional information that would impact the decision to deny her requested accommodation of an 8-hour day shift schedule. Kallail responded that at one time, DDC management considered establishing an 8-hour day shift schedule for two Resource Coordinators in Cedar Rapids.[6] Kleisch informed Kallail that while the 8-hour day shift schedule had been considered by Alliant, it was determined that such a schedule did not serve the business interests of the DDC.[7]

---

[6] According to Kallail:

> In 2002, the idea of creating two permanent straight 8 hours shifts was discussed. A committee was formed to consider the pros and cons of doing so. There was near unanimous agreement that the pros of doing so outweighed the cons. There was considerable support among the employees for creating the two permanent day shifts. The creation of two day shifts was going to happen. Then, Mr. Heinrichs announced that the two people to get the day shi[f]ts would be determined by drawing their names after [sic] a hat. A random selection was unacceptable to many, and because the two slots were going to be filled randomly, support for the position vanished.

See Kallail's Appendix (docket nubmer 19-2) at 5; Affidavit of Terri Kallail at ¶ 16.

[7] In her deposition, Kleisch stated:

> And Gary indicated to me that several years prior to 2004, they looked into establishing a straight shift, and after looking into it, it was determined that it wasn't feasible, you know, due to the business requirements that they had. And so they made the business decision that the rotating swing shifts would be the standard.

See Alliant's Appendix (docket number 12-3) at 60; Kleisch Deposition at 35:6-12.

In his deposition, Mark Reynolds, DDC Supervisor, states:

(continued...)

On August 29, 2005, Kleisch provided Kallail with a list of three open positions for which Kallail was qualified, and did not require rotating shifts. The positions were Fleet Assistant in Cedar Rapids, Office Administrator in Marshalltown, Iowa, and Meter Reader in West Union, Iowa. Kallail informed Kleisch that she was not interested in any of the positions because the positions paid less than her Resource Coordinator position, the Office Administrator position and Meter Reader position required relocation or a significant commute, and the Meter Reader position required significant walking.[8]

On September 12, 2005, Kallail commenced leave under the Family and Medical Leave Act for surgery on her leg. On September 21, 2005, Kallail underwent by-pass surgery on her left leg to increase blood flow to her left foot. Initially, Kallail was scheduled to return to work on December 5, 2005, but while on leave, Kallail's left big toe became infected. Kallail requested an extension of her leave to February 13, 2006. On December 14, 2005, her left big toe was amputated. On January 9, 2006, Kallail underwent heel cord lengthening.

While on leave, Kallail applied for a DDC Administrator position in Cedar Rapids. The position was on a straight 8-hour day shift schedule. The job requirements for the position included education or experience equivalent to a Bachelor's Degree in business

_____

[7] (...continued)
> [S]everal times we've checked into changing the schedule and our conclusion after doing that has been the the best thing for the DDC is to leave the schedule the way it is. . . .
>
> Well, as I said several times, I know one time . . . there was some talk about doing some permanent day shifts or just seeing if there's a better way to work the schedule. . . . I know that there were several proposals that came out, and all I know that happened is they ended up not changing it[.]

See Alliant's Appendix (docket number 12-4) at 96; Reynolds Deposition at 18:23-19:1, 19:13-21.

[8] Kallail is limited in her ability to walk. See Kallail's Appendix (docket nubmer 19-2) at 3-5, 7; Affidavit of Terri Kallail at ¶¶ 12-14, 22.

management, demonstrated effective leadership and supervisory skills, a minimum of five years progressively more responsible experience in dispatching, demonstrated competence in problem analysis and computer applications such as Word and Excel, and demonstrated knowledge of DDC operations. Ten individuals, including Kallail, applied for the position. Six, including Kallail, were interviewed. Kallail described her interview as follows:

> The interviews were conducted by Gary [Heinrichs, DDC Manager], Mark [Reynolds, DDC Supervisor], and Staffing Specialist Carla Kinch. Everyone in the room knew that my first request for accommodation in my current position was pending. The first question that I was asked at the interview was whether I needed an accommodation. I later learned that this was not asked of other candidates. I was later told that my prior experience with the company would not be considered, only the topics covered during the interview. It was thus ominous that the first topic covered was accommodations. Gary also raised specific concerns about my ability to handle emergencies 24/7 based on the pending requested accommodation. Neither me nor my doctor ever suggested that I could not be called in to work in emergency situations and I attempted to assure Gary, and the others that I would be able to handle emergencies as I always had in the past.

*See* Kallail's Appendix (docket nubmer 19-2) at 8; Affidavit of Terri Kallail at ¶ 25; *see also* Kallail's Statement of Additional Material Facts that Preclude Entry of Summary Judgment (docket number 19-1) at 16-17; ¶¶ 57-58.

In February 2006, Eric Harms was offered the DDC Administrator position. Kallail was informed that she did not get the DDC Administrator position. According to Kallail, she was told that the primary reason she did not get the position was because she did not have experience drawing up a training program.[9]

---

[9] *See* Kallail's Appendix (docket number 19-2) at 8; Affidavit of Terri Kallail at ¶ 25; *see also* Kallail's Statement of Additional Material Facts that Preclude Entry of Summary Judgment (docket number 19-1) at 18; ¶ 62.

On February 10, 2006, Alliant received a release from Kallail's physician allowing her to return to work with a restriction that she only work an 8-hour day shift schedule until May 13, 2006. Alliant allowed Kallail to work an 8-hour day shift schedule for the period of time recommended by Kallail's physician. While she was on the 8-hour day shift schedule, Kallail's duties included training two new hires, drafting training materials, and performing some side jobs for Mark Reynolds, the DDC Supervisor.

On March 20, 2006, Kallail submitted a new accommodation request to Alliant. Again, Kallail requested a permanent 8-hour day shift schedule. Similarly, as an accommodation, Kallail's physician once again suggested "[n]o swing shifts, day shift recommended."[10] On April 13, 2006, Kallail provided Kleisch with a proposed schedule that would allow her and a teammate to work an 8-hour day shift schedule in the Resource Coordinator position, but require the other Resource Coordinators to work 8-week rotating shift schedules. Kleisch provided Kallail's proposal to Gary Heinrichs, DDC Manager, and Diane Schuler, Director of Customer Service and DDC. Heinrichs provided the following email response to Kleisch:

> This is no change from the original[.] [Kallail] is proposing a permanent shift[.] All of the documentation I have sent you states that we do not want to do that[.]

*See* Kallail's Appendix (docket number 19-2) at 70. Six minutes later, Schuler added that:

> I would also state that as we discussed before, it's not that we don't 'want' to do this, it's that we can't afford to do this based on our current (and perceived future) staffing levels.

*Id.* Alliant concluded that Kallail's proposal was not reasonable, and denied her request.

On May 11, 2006, Kleisch faxed a letter to Kallail's physician, Dr. Stahlberg, asking her opinion on Kallail's ability to perform the Resource Coordinator position, the limitations or restrictions that should be placed on Kallail, and any recommendations for

---

[10] *See* Kallail's Appendix (docket number 19-2) at 69.

work accommodations.[11] Alliant received a response from Dr. Stahlberg on June 1, 2006. In her response, Dr. Stahlberg opined that:

> [Kallail] is a patient of mine with type 1 diabetes. She requires insulin pump therapy to maintain adequate blood sugar levels. Her type 1 diabetes and its complications limit her ability to walk and to function at odd hours. She is unable to maintain her blood sugars at an appropriate level with an irregular schedule. The dawn effect causes her blood sugars to rise in the morning. Normal circadian rhythm is benefitted by daily work and night time rest. I recommend that she should work a straight eight-hour day shift. . . .
>
> In my assessment, [Kallail] certainly can perform her job function with the above accommodations. I am concerned about her overall lifetime risk regarding progression of nephropathy, neuropathy and peripheral vascular disease. The best way to protect her from lifetime complications is by managing tight glycemic control. In [Kallail] this is best met my [sic] maintaining her on an insulin pump and consistency in her work schedule. My recommendation again is a daytime eight-hour shift to provide her the most consistency. . . .

*See* Alliant's Appendix (docket number 12-3) at 31. Based on Dr. Stahlberg's recommendations, Alliant determined that Kallail could no longer work as a Resource Coordinator because of the rotating shifts. Kallail was removed from the Resource Coordinator position, and she and Alliant continued exploring open positions for which she was qualified and could be assigned as a reasonable accommodation.

On June 19, 2006, Alliant offered Kallail reassignment to one of two open Customer Operation Assistant positions in Cedar Rapids. Kallail declined Alliant's offer, and requested paperwork to apply for short-term disability benefits. Kallail applied for and received short-term disability benefits beginning on June 23, 2006. In late July, Alliant forwarded information to Kallail regarding a Team Lead Billing position in Cedar Rapids. After meeting with the Team Lead Billing supervisor, Kallail declined to apply for the position because she believed she was not qualified for it. On September 13, 2006, Alliant

---

[11] Alliant initially contacted Dr. Stahlberg for this information in March 2006.

offered Kallail a Construction Specialist position in Cedar Rapids. Because she "had gotten another ulcer on the bottom of [her] foot," Kallail declined Alliant's offer.[12] Subsequent to September 13, 2006, Kallail has not applied for any job with Alliant.

Ultimately, Kallail applied for and received long-term disability benefits under Alliant's long-term disability plan, effective January 1, 2007.[13] Kallail also applied for social security disability benefits. In her social security disability benefits application, Kallail stated that her disability onset date was June 23, 2006. The Social Security Administration determined that Kallail was disabled beginning on June 23, 2006, and awarded benefits. Kallail continues to receive benefits, and has not sought employment since leaving Alliant.

## IV. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding

---

[12] *See* Kallail's Appendix (docket number 19-2) at 28; Kallail Deposition at 87:25-88:1.

[13] Kallail's long-term disability benefits are 67% of her last salary as a Resource Coordinator. Kallail's most recent salary was $58,852.

in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

Furthermore, "summary judgment is disfavored in employment discrimination cases" because such cases are "inherently fact-based." *Simpson v. Des Moines Water Works*, 425 F.3d 538, 542 (8th Cir. 2005); *see also Mayer v. Nextel West Corp.*, 318 F.3d 803, 806 (8th Cir. 2003) ("'[S]ummary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based.'") (quoting *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919 (8th Cir. 1999))). In an employment discrimination case, summary judgment should only be granted "if the evidence could not support any reasonable inference of discrimination." *Elnashar v. Speedway SuperAmerica, LLC*, 484 F.3d 1046, 1055 (8th Cir. 2007); *see also Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) ("Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant.").

## V. DISCUSSION

### A. Kallail's State and Federal Claims

Kallail alleges disability discrimination under both the ADA and ICRA. When the parties in disability discrimination litigation "do not dispute the application of federal analysis, disability claims under the ICRA are generally analyzed in accord with the ADA." *Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007) (citing *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005)); *see also Tjernagel v. Gates Corp.*, 533 F.3d

11

666, 671 (8th Cir. 2008) ("ADA and ICRA disability claims are analyzed under the same standards."); *Casey's General Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003) (providing that the ICRA "only pronounces a general proscription against discrimination and we have looked to the corresponding federal statutes to help establish the framework to analyze claims and otherwise apply our statute"); *Schlitzer v. University of Iowa Hospitals & Clinics*, 641 N.W.2d 525, 529 (Iowa 2002) ("The common goals of the Federal ADA and our civil rights act have encouraged us to look to the federal statutory and regulatory standards in applying our statute."). Therefore, the Court will analyze both Kallail's ADA and ICRA disability discrimination claims using federal law.

## B. Analytical Framework Under the ADA

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees. . . ." 42 U.S.C. § 12112(a) (2006).[14] *See also Gretillat*, 481 F.3d at 652. The ADA further prohibits employers from:

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity. . . .

---

[14] The ADA was amended by Congress through the enactment of the ADA Amendments Act of 2008 ("ADAAA"), effective January 1, 2009. *See* Pub. L. No. 110-325, § 8, 122 Stat. 3553. In this case, the alleged discrimination occurred in 2004-2007. Neither party argues for retroactive application of the amendment, and the Court determines that retroactive application is not warranted. *See Nyrop v. Independent School District No. 11*, 616 F.3d 728, 734 n. 4 (8th Cir. 2010), (providing that the Eighth Circuit Court of Appeals joins the First, Fifth, Sixth, Seventh, Ninth, and D.C. Circuits in determining that the amendments do not apply retroactively because Congress did not provide for retroactive application of the amendments); *see also Haigh v. Gelita USA, Inc.*, 2009 WL 2835164 at *6, n.11 (N.D. Iowa 2009) (retroactive application of ADAAA not warranted).

42 U.S.C. § 12112(b)(5)(A). *See also Peyton v. Fred's Stores of Arkansas, Inc.*, 561 F.3d 900, 902 (8th Cir. 2009). "As the statutory language indicates, ADA protection extends only to a qualified individual with a disability, namely, 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'" *Id.* (quoting 42 U.S.C. § 12111(8)); *see also Casey's General Stores, Inc.*, 661 N.W.2d at 519 ("The [ICRA] prohibits an employer from discriminating against a qualified person with a disability because of the person's disability.").

A claim of disability discrimination under the ADA may be established either through circumstantial evidence of discrimination or through direct evidence of discrimination. *Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1034 (8th Cir. 2007). Kallail presents no direct evidence of discrimination, and in absence of such evidence, courts generally analyze ADA claims under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Lors v. Dean*, 595 F.3d 831, 834 (8th Cir. 2010). However, if a plaintiff makes a reasonable accommodation claim, courts do not apply the *McDonnell Douglas* framework, but instead apply a modified burden-shifting analysis. *Fenney v. Dakota, Minnesota & Eastern Railroad Co.*, 327 F.3d 707, 711-12 (8th Cir. 2003).

In her petition, Kallail alleges that: (1) Due to her diabetes she "was disabled, had a record of being disabled, and/or was regarded as being disabled within the meaning of the [ADA] and [ICRA] in that [she] was substantially limited, or regarded as being substantially limited in engaging in one or more major life activities, included but not limited to walking,"[15] and (2) Alliant "was aware that [Kallail] had Diabetes, and [Kallail] sought to be reasonably accommodated for her disability. [Alliant] failed to reasonably accommodate [Kallail]."[16] Kallail concludes that she is entitled to damages because

---

[15] *See* Kallail's Petition at Law and Jury Demand (docket number 2) at 10; ¶ 49.

[16] *Id.*; ¶ 50.

Alliant's actions violated her rights under the ADA and ICRA.[17] From her petition, the Court concludes that Kallail is making a reasonable accommodation claim.[18] Therefore, the Court will apply the modified burden-shifting analysis to Kallail's reasonable accommodation claim.

Under the modified burden-shifting approach:

> [T]he employee 'must first make a facial showing that he has an ADA disability and that he has suffered an adverse employment action. Then he must make a facial showing that he is a "qualified individual."' 'To be a "qualified individual" within the meaning of the ADA, and employee must "(1) possess the requisite skill, education, experience, and training for his position, and (2) be able to perform the essential job functions, with or without reasonable accommodation."' In cases where the employee claims that he is able to perform the essential functions of the job with reasonable accommodation, the employee 'must only make a "facial showing that a reasonable accommodation is possible."' When the employee has made that facial showing 'the burden then shifts to the employer to show that it is unable to accommodate the employee.'

*Brannon v. Luco Mop Co.*, 521 F.3d 843, 848 (8th Cir. 2008) (quotations and citations omitted). "'If the employer can show that the employee cannot perform the essential functions of the job even with reasonable accommodation, then the employee must rebut that showing with evidence of his individual capabilities.'" *Fenney*, 327 F.3d at 712 (quotation omitted). "'At that point, the employee's burden merges with his ultimate burden of persuading the trier of fact that he has suffered unlawful discrimination.'" *Id.*

---

[17] Id.; ¶ 51-53.

[18] The Court also points out that in her brief, Kallail concedes that Alliant did not regard her as disabled. Specifically, she states that "[e]ven though [Kallail] was clearly disabled under the ADA, it does not appear that she was regarded as being disabled under the ADA." *See* Kallail's Brief in Resistance to Defendant's Summary Judgment Motion (docket number 24-1) at 27. Accordingly, the Court will not consider or address whether Alliant regarded Kallail as disabled in considering the motion for summary judgment on Kallail's reasonable accommodation claim.

### C. Does Kallail Have a Disability as Defined by the ADA?

Kallail must first make a facial showing that she has a disability as defined by the ADA. *See Brannon*, 521 F.3d at 848. "Disability" is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment.'" 42 U.S.C. § 12102(1)(A)-(C); *Breitkreutz v. Cambrex Charles City, Inc.*, 450 F.3d 780, 783 (8th Cir. 2006). Here, Kallail claims that she has an actual disability; that is, a physical impairment – diabetes – that substantially limits one or more of her major life activities.

For purposes of the ADA, an impairment "must be substantial, that is, considerable or to a large degree." *Samuels v. Kansas City Missouri School District*, 437 F.3d 797, 801 (8th Cir. 2006) (citation omitted). An individual is substantially limited in a major life activity, if he or she is "unable to perform a basic function the average person in the general population can perform, or is significantly restricted in the condition, manner, or duration under which [he or] she can perform a major life activity as compared to an average person in the general population." *Id.* (citing 29 C.F.R. § 1630.2(j)(1)(i)-(ii)). Major life activities include "'functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Gretillat*, 481 F.3d at 652 (quoting 29 C.F.R. § 1630.2(i)). More generally, major life activities include "'activities that are of central importance to daily life.'" *Id.* (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002)). In determining whether an individual is limited in a major life activity, courts must consider: (1) The nature and severity of the impairment; (2) the duration or anticipated duration of the impairment; and (3) the actual or expected long-term impact of the impairment. *Samuels*, 437 F.3d at 802 (citation omitted).

In its brief, Alliant assumes that Kallail will argue that she is substantially limited in the major life activity of working. Specifically, Alliant states that "[Kallail] alleges that she has Type 1 diabetes that substantially limited her ability to work the rotating shift

required of a Resource Coordinator."[19]  However, contrary to Alliant's assumption, in her brief resisting Alliant's motion for summary judgment, Kallail states that the major life activities at issue are walking and eating.  Specifically, Kallail states "[t]here can be no doubt that the manner and duration of [Kallail's] ability to engage in walking and eating are significantly restricted when compared to the average person."[20]

In support of her position regarding the major life activity of walking, Kallail points out that due to her diabetes, neuropathy, and peripheral vascular disease:  (1) she has a handicap parking permit to limit distances she must walk[21]; (2) she has difficulty walking even one-half block[22]; (3) she uses an electric wheelchair when she needs to walk long distances[23]; and (4) she has to use crutches when she walks short distances.[24]  As to the major life activity of eating, Kallail quotes a Ninth Circuit Court of Appeals case, *Rohr v. Salt River Project Agricultural Improvement and Power District*, 555 F.3d 850 (9th Cir. 2009), dealing with a Type 2 diabetic's substantial limitation with eating.  *See id.* at 858-60.  Kallail states that she "has presented similar facts in the present case."[25]  The Court assumes that the "similar facts" presented in this case, include Kallail's explanation that:

> In order to maintain acceptable blood sugar levels, I must carefully manage the timing, frequency, quantity, carbohydrate count and quality of the food and drink I consume.  For example I must eat smaller meals thruout [*sic*] the day.  Eating one big meal will likely cause my blood sugar to spike, and if

---

[19] *See* Alliant's Memorandum of Authorities (docket number 12-5) at 16.

[20] *See* Kallail's Brief in Resistance (docket number 24-1) at 24.

[21] *See* Kallail's Appendix (docket number 19-2) at 3; Affidavit of Terri Kallail at ¶ 13.

[22] *Id.*

[23] *Id.*; Affidavit of Terri Kallail at ¶ 12.

[24] *Id.* at 4; Affidavit at of Terri Kallail at ¶ 14.

[25] *See* Kallail's Brief in Resistance (docket number 24-1) at 24.

I go too long between eating, my blood sugar may become
dangerously low. I also must try to avoid high fat meals which
raise my blood sugar. What I can eat and the quantity is also
dependent on the blood sugars at the time.

Maintaining some sense of routine is extremely important to
the management of diabetes. Without consistency in when,
what and how much I eat, and without consistency in when I
take my daily medications (the diabetes requires medications
be taken at the same time every day), it becomes increasingly
difficult to maintain my blood sugar at acceptable levels.
Damage and complications occurs to the body when blood
sugar levels reach extremes, either too high or low.

*See* Kallail's Appendix (docket number 19-2) at 2-3; Affidavit of Terri Kallail at ¶¶ 7-8;
*see also id.* at 1-2; Affidavit of Terri Kallail at ¶¶ 3-6 (also discussing aspects of eating
and diabetes).

In its reply brief, Alliant offers no argument or response to Kallail's contention that
her diabetes substantially limits her major life activities of walking and eating. Failure to
brief an issue in more than a "perfunctory manner," allows a court to consider the issue
waived. *Ramirez v. Debs-Elias*, 407 F.3d 444, 447 at n.3 (1st Cir. 2005) (cited with
approval in *United States v. Johnson*, 403 F. Supp. 2d 721, 764 (N.D. Iowa 2005)).
*See also* Local Rule 7.d (requiring the movant to provide a brief containing "citations to
the authorities upon which the moving party relies"); *Chay-Velasquez v. Ashcroft*,
367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim
in his opening brief, it is waived.").

Viewing the evidence in the light most favorable to Kallail, the Court finds that
Kallail has made a facial showing that she has a disability as defined by the ADA. In other
words, Kallail has presented sufficient evidence that she is substantially limited in the
major life activities of walking and eating to preclude summary judgment on the ground
that she is not disabled as defined by the ADA. *See Brannon*, 521 F.3d at 848 (providing
that in a reasonable accommodation claim, the plaintiff must make a facial showing that
he or she has a disability as defined by the ADA); *Samuels*, 437 F.3d at 801 (defining

disability under the ADA as a physical impairment that substantially limits one or more major life activities).

### D. Is Kallail a "Qualified Individual" as Defined by the ADA?

Next, Kallail must make a facial showing that she is a "qualified individual" under the ADA. *See Brannon*, 521 F.3d at 848. A person is a "qualified individual" under the ADA, if he or she "satisfies the requisite skill, experience, education, and other job-related requirements, and 'can perform the essential job functions, with or without reasonable accommodation.'" *Rehrs v. Iams Co.*, 486 F.3d 353, 356 (8th Cir. 2007) (quoting *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1016 (8th Cir. 2000)); *see also Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001) (In order to be a qualified individual under the ADA, a plaintiff must "(1) possess the requisite skill, education, experience, and training for [his or] her position; and (2) be able to perform the essential job functions, with or without reasonable accommodation.").

Here, it is undisputed that Kallail possesses the requisite "skill, education, experience, and training," necessary to perform the Resource Coordinator job. Alliant asserts, however, that Kallail is unable to perform "essential job functions." Essential job functions are the fundamental job duties of an employment position, but do not include the marginal functions of the position. *Canny v. Dr. Pepper/Seven-Up Bottling Group, Inc.*, 439 F.3d 894, 900 (8th Cir. 2006); *see also* 29 C.F.R. § 1630.2(n)(1) (providing the definition of essential functions). The types of evidence a court should consider in determining whether a function is essential includes:

> (1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; (5) the terms of a collective bargaining agreement; (6) the work experience of past incumbents in the job; and (7) the current work experience of incumbents in similar jobs.

*Rehrs*, 486 F.3d at 356 (citing 29 C.F.R. § 1630.2(n)(3)); *Heaser*, 247 F.3d at 831.

Alliant argues that Kallail is not a "qualified individual" within the meaning of the ADA because she could not perform an essential function of her Resource Coordinator position, namely working the required rotating shift schedule. Kallail counters that if she was given the reasonable accommodation of having a straight 8-hour day shift schedule instead of the rotating shift schedule, then she would be capable of performing the essential functions of the Resource Coordinator position. Because this is a reasonable accommodation claim, and it appears undisputed that Kallail can perform the essential functions of the Resource Coordinator position with an accommodation, she is required to "only make a 'facial showing that a reasonable accommodation is possible. . . .'" *Brannon*, 521 F.3d at 848 (quoting *Fenney*, 327 F.3d at 712, in turn quoting, *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995)).

Kallail asserts that putting her on a straight 8-hour day shift schedule – as opposed to the rotating shift schedule – was a reasonable accommodation that was possible, and would have allowed her to perform the essential functions of the Resource Coordinator position. In support of her argument, Kallail offers four reasons that the rotating shift schedule is not an essential function of the Resource Coordinator position: (1) Alliant offered her a straight 8-hour night shift schedule as an accommodation; (2) prior to her first accommodation request, Alliant considered creating two permanent straight 8-hour day shift schedules for the Resource Coordinator position in Cedar Rapids; (3) the DDC in Wisconsin employs a straight 8-hour shift schedule for its Resource Coordinators; and (4) Alliant Vice President, Vern Gebhart, told Kallail's husband that "a new job would be waiting for [Kallail] when she returned to work following her medical leave, and it would be straight days."[26]

---

[26] *See* Kallail's Statement of Additional Material Facts that Preclude Entry of Summary Judgment (docket number 19-1) at 16; ¶ 54.

First, Kallail claims that Alliant offered her a straight night shift in response to her request for an accommodation.[27] Specifically, Kallail refers to a letter to her attorney, dated October 11, 2007, in which Dr. Stahlberg states that she received a call from Alliant in December 2004, indicating that "a permanent night shift was available for Terri Kallail."[28] Interestingly, Kallail herself, never claims that she was offered an 8-hour night shift schedule as an accommodation. Furthermore, there is no evidence in the record that Alliant ever made such an offer to Kallail.[29]

In addressing Kallail's claim that it offered her an 8-hour night shift schedule as an accommodation, Alliant asserts that the 2007 letter from Dr. Stahlberg is not properly authenticated. That is, Alliant argues that Dr. Stahlberg's "unsworn statements [in the letter] are inadmissible hearsay and cannot serve as a basis to create a genuine issue of fact." *See* Alliant's Response to Plaintiff's Statement of Additional Material Facts (docket number 26) at 3; ¶ 30; Alliant's Reply Brief (docket number 27) at 2.

Alliant further points out that in December 2004, Heidi Hoffland, an HR employee with Alliant, left a message for Dr. Stahlberg with a nurse, stating that Alliant "may not be able to accommodate a straight day shift but may be able to accommodate a straight evening/night shift."[30] In her deposition, Hoffland explained that:

> Q:  Okay. What was that based, the possibility that a night shift might be able to be accommodated, what was that based on?
> A:  I can't tell you what it was based on other than there could have been a conversation that occurred that would

---

[27] *See* Kallail's Statement of Additional Material Facts that Preclude Entry of Summary Judgment (docket number 19-1) at 9; ¶ 30.

[28] *See* Kallail's Appendix (docket number 19-2) at 87.

[29] *See* Alliant's Response to Plaintiff's Statement of Additional Material Facts (docket number 26) at 3; ¶ 30.

[30] *See* Alliant's Supplemental Appendix (docket number 27-1) at 228; Hoffland Deposition at 21:11-14.

> have maybe, they were looking into this possibility if
> this was feasible[.] . . .

*See* Alliant's Supplemental Appendix (docket number 27-1) at 228; Hoffland Deposition at 21:15-22. Alliant maintains that Hoffland did not tell Dr. Stahlberg that Alliant had a straight 8-hour night schedule position for Kallail, but instead, asked Dr. Stahlberg about whether Kallail could "work a straight night shift in an attempt to more precisely determine [Kallail's] limitations so that effective accommodations could be considered."[31]

In determining whether the rotating shift schedule is an essential function of the Resource Coordinator position, the Court declines to consider Kallail's claim that Alliant offered her a straight night shift schedule as an accommodation, because Kallail offers no evidence to support her claim, other than Dr. Stahlberg's 2007 letter to Kallail's attorney, which is an unsworn hearsay statement. *See Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004) (a plaintiff cannot rely on hearsay to avoid summary judgment); *Mays v. Rhodes*, 255 F.3d 644, 648 (8th Cir. 2001) (same). Furthermore, based on Hoffland's deposition testimony, it appears that Alliant simply considered a straight night shift schedule as an accommodation, but no formal offer of such an accommodation was ever made to Kallail. Accordingly, the Court finds that Kallail's first reason that the rotating shift schedule is not an essential function of the Resource Coordinator position is without merit.

Turning to Kallail's second reason that the rotating shift schedule is not an essential function of the Resource Coordinator position, Kallail argues that in 2002, two years prior to her requested accommodation, Alliant considered creating two permanent straight 8-hour day shift schedules for the Resource Coordinator position. Specifically, Kallail states in her affidavit that there was "near unanimous agreement that the pros of doing so outweighed the cons" and "the creation of two day shifts was going to happen," but that "support for the position vanished" when employees learned how the day shift workers

---

[31] *See* Alliant's Reply Brief (docket number 27) at 1.

would be selected.[32] In response, Alliant argues that merely considering the creation of two 8-hour day shift schedules for the Resource Coordinator position in Cedar Rapids – two years prior to Kallail's request for such an accommodation – is insufficient evidence to draw the conclusion that the rotating shift schedule is not an essential function of the Resource Coordinator position. In her deposition, Kleisch stated that creating a straight 8-hour day shift schedule for the Resource Coordinator position wasn't feasible due to Alliant's business requirements and therefore, Alliant "made the business decision that the rotating swing shifts would be the standard."[33] Similarly, in his deposition, Mark Reynolds, DDC Supervisor, stated that there are training advantages to having the rotating shift and "it was not to the DDC's advantage and/or -- what's the right word, business practice. The best business practice was not have that day shift."[34]

Even though Kallail claims that in 2002, Alliant's consideration of creating two 8-hour straight day shift schedules for the Resource Coordinator position "was going to happen," and the two 8-hour straight day shift schedues would meet the needs of the DDC, the fact remains that Alliant chose not to create two 8-hour straight day shift schedules for the Resource Coordinator position. Specifically, Reynolds stated in his deposition that:

> I know that several times we've checked into changing the schedule and our conclusion after doing that has been that the best thing for the DDC is to leave the schedule the way it is. . . .
>
> [T]he advantages of the way our schedule is set out -- we have people working [with] partners for a year and they rotate through a nine-week rotation. The advantages of that system gives us opportunities for everybody to work all the areas of coverage. It allows -- within that partnership, because those

---

[32] *See* Kallail's Appendix (docket nubmer 19-2) at 5; Affidavit of Terri Kallail at ¶ 16.

[33] *See* Alliant's Appendix (docket number 12-3) at 60; Kleisch Deposition at 35:6-12.

[34] *Id*. at 97; Reynolds Deposition at 25:19-22.

partners help each other out and cover each others' desks, and they get to learn each others' weaknesses and strengths and basically get to learn from each other, the -- because of that.

And then also the nine-week rotation -- the senior group actually has an eight-week rotation, so having the partners rotate at the nine-week and the seniors rotated at the eight-week gives us -- those resource coordinators end up spending, I think, three or four weeks with the same senior during one rotation, and the next rotation they're with a different senior. So again, for experience and training purposes, that has a great deal of advantage to us.

By having the nine-week rotation, of those nine weeks you will only work two weekends. So by pulling out a rotation, so to speak, the disadvantages that gave the DDC, it just created too much -- it was not to the DDC advantage and/or -- what's the right word, business practice. The best business practice was to not have that day shift there.

*See* Alliant's Appendix (docket number 12-3) at 97; Reynolds Deposition at 18:23-19:1, 24:22-25:22.

All Resource Coordinators in Cedar Rapids are required to work the rotating shift. Under such circumstances, a rotating shift is not discriminatory. *Rehrs*, 486 F.3d at 358 ("P & G required all employees in Rehrs' position to rotate shifts. Such a generally applicable requirement was not discriminatory."). Furthermore, "[i]t is not the province of the court to question the legitimate operation of a production facility or determine what is the most productive or efficient shift schedule for a facility." *Id.* (Citation omitted). Accordingly, the Court finds that Alliant's consideration of having two 8-hour day shift schedules for the Resource Coordinator position, but ultimate decision not to create such schedules, is insufficient evidence to support Kallail's contention that the rotating shift schedule is not an essential function of the Resource Coordinator position. *See Rehrs*, 486 F.3d at 356-57; *see also* 29 C.F.R. § 1630.15(c) (a defense to a charge of disability discrimination is to show that the challenged standard, criterion, or policy is job-related and consistent with business necessity).

Kallail's third reason reason that the rotating shift schedule is not an essential function of the Resource Coordinator position is that Alliant's Resource Coordinators at the DDC in Wisconsin work straight 8-hour shift schedules. In her affidavit, Kallail explains that:

> The DDC East in Wisconsin utilizes permanent eight hour shifts. The major difference between DDC East, and DDC West (where I worked) is that West is responsible for switching. Switching is the de-energization of a line so that crews can work safely on the line. That job is done in the field there. Of course although switching was done in DDC West, it was not done by me or other Resource coordinators. Switching was done by lead resource coordinators, a completely different position and who had different schedule rotation than the resource coordinators. Regarding another alleged difference, the DDC East was more willing to turn dispatching over to the field in case of a storm, it should be noted that in big storms DDC West would also have dispatching done in the field.

*See* Kallail's Appendix (docket nubmer 19-2) at 9; Affidavit of Terri Kallail at ¶ 28. In response, Alliant argues that there are substantial differences between the DDC in Cedar Rapids and the DDC in Wisconsin. In his deposition, Reynolds explained that:

> The DDC East, is what we call it, they are a union shop. They -- their function on a day-to-day basis is the only thing that they dispatch is a same-day order. So a same-day order would be an electric or gas emergency or a non-pay reconnect. . . .
>
> The DDC West, which is the Iowa portion, dispatches all orders, schedules the orders. They're responsible for switching. With -- switching is the energization of a line so that crews can work safely on that line. The -- so in general terms, I would say the DDC West, that's the Iowa portion, has more responsibility in how business is conducted.

*See* Alliant's Appendix (docket number 12-4) at 98; Reynolds Deposition at 30:11-15, 30:17-23.

The Court is unpersuaded by Kallail's contention that because Resource Coordinators at the DDC in Wisconsin work straight 8-hour shift schedules, then the rotating shift schedule for Resource Coordinators at the DDC in Cedar Rapids must be non-essential. Alliant points out that there are significant differences between the DDC in Wisconsin and the DDC in Cedar Rapids, including Resource Coordinators at the Wisconsin DDC being members of a collective bargaining unit and having different job duties than Resource Coordinators in Cedar Rapids. Alliant has determined that the job duties by a Resource Coordinator in Cedar Rapids require a rotating shift. Specifically, Alliant maintains that "operation of the Iowa DDC is more productive and efficient when a rotating shift schedule is used[.]"[35]

In *Rehrs*, a company took over a warehouse and implemented a rotating shift schedule. 486 F.3d at 354. Prior to the company taking over the warehouse, it was operated on straight 8-hour shifts. After the company sold the warehouse, it was again operated on straight 8-hour shifts. *Id*. at 354-55. Nonetheless, the Eighth Circuit Court of Appeals found shift rotation was an essential function of the plaintiff's job, and the fact that the plant was operated on straight shift schedules before and after the company employing the rotating shift operated the plant, was irrelevant to a determination that the rotating shift was an essential function of the plaintiff's job. *Id*. at 357. Specifically, the Eighth Circuit found that the company "does not have to exercise the same business judgment as other employers who may believe a straight shift is more productive. It is not the province of the court to question the legitimate operation of a production facility or determine what is the most productive or efficient shift schedule for a facility." *Id*. at 358 (citation omitted). Similarly, here, Alliant has determined that a rotating shift schedule is essential for Resource Coordinators at the Cedar Rapids DDC. Because of the differences between the Cedar Rapids DDC and the Wisconsin DDC, the Court will not question Alliant's business decision to schedule Resource Coordinators in Wisconsin on a straight

---

[35] *See* Alliant's Reply Brief (docket number 27) at 2.

8-hour shift schedule as opposed to the rotating shift schedule for Resource Coordinators in Cedar Rapids. *Id.* at 356-58. Accordingly, the Court determines that the Wisconsin DDC's use of straight 8-hour shift schedules is insufficient evidence to support Kallail's contention that the rotating shift schedule is not an essential function of the Resource Coordinator position. *See Rehrs*, 486 F.3d at 356-57; *see also* 29 C.F.R. § 1630.15(c) (a defense to a charge of disability discrimination is to show that the challenged standard, criterion, or policy is job-related and consistent with business necessity).

Finally, Kallail claims that statements made by Alliant Vice President Vern Gebhart support a finding that a rotating shift schedule is not an essential function of the Resource Coordinator position. Alliant correctly points out that Vern Gebhart's conversation with Kallail's husband simply indicated that a new job would be available to Kallail with a day shift schedule. There is no evidence that Gebhart told Kallail's husband that Kallail's schedule as a Resource Coordinator would be modified for her to have a straight 8-hour day shift schedule. Alliant correctly states that "[t]he offer of different jobs with 8-hour day shifts to [Kallail] in no way indicates that rotating shifts were not an essential function of the Resource Coordinator job."[36] The Court finds that the conversation between Gebhart and Kallail's husband is irrelevant to the issue of whether a rotating shift schedule is an essential function of the Resource Coordinator position.

Turning to the ultimate issue of whether the rotating shift schedule for Resource Coordinators in Cedar Rapids is an essential function of the position, the Court finds that the Eighth Circuit's decision in *Rehrs* is on point. The facts in *Rehrs* are similar to the facts in this case. Rehrs, who suffered from Type 1 diabetes, was a warehouse technician for Iams Company. *Id.* at 354. When he started working at Iams, Rehrs was on a straight-shift schedule from 4 p.m. to midnight. *Id.* During Rehrs' employment, Iams was purchased by Proctor and Gamble, Inc. ("P & G"), and it implemented a rotating shift schedule for all of the warehouse technicians. *Id.* Rehrs worked the rotating shift for

---

[36] *See* Alliant's Reply Brief (docket number 27) at 3.

approximately two years, when he suffered a heart attack. *Id*. at 355. About a month after Rehrs returned to work from short-term disability leave, his doctor requested that P & G place him on a fixed daytime schedule "because his diabetes had become difficult to control." *Id*. P & G accommodated Rehrs with a straight eight-hour day shift for 60 days, but refused to make it a permanent accommodation, claiming shift rotation was an essential function of Rehrs' job. *Id*. On appeal, the Eighth Circuit Court of Appeals determined that shift rotation was an essential function of the warehouse technician position. Specifically, the Eighth Circuit found that:

> P & G required all employees in Rehrs's position to rotate shifts. Such a generally applicable requirement was not discriminatory. The ADA does not require P & G to create a new straight shift position for Rehrs. 'The ADA does not require affirmative action in favor of individuals with disabilities. It merely prohibits employment discrimination against qualified individuals with disabilities, no more and no less.'

*Id*. at 358 (citations and quotation omitted). The Eighth Circuit further explained that Rehrs' desire to have P & G create a straight shift position for him was misplaced. "P & G was not required to eliminate an essential function of the warehouse technician job to accommodate its disabled employee nor was P & G required to create a new straight-shift technician position or similar position to accommodate Rehrs." *Id*. at 359 (citations omitted). The Eighth Circuit concluded that summary judgment was appropriate because Rehrs' "restrictions to work only a straight shift rendered him unqualified to carry out the essential functions of his P & G technician job." *Id*.; *see also Turco v. Hoechst Celanese Corp*., 101 F.3d 1090, 1094 (5th Cir. 1996) (finding that creating a straight day shift for an employee with diabetes when all other employees in the same position worked on a rotating shift was not an accommodation required under the ADA).

Similar to *Rehrs*, the Court finds that Alliant has shown that the rotating shift schedule for the Resource Coordinator position in Cedar Rapids is an essential function of the job. Alliant has determined that the job duties by a Resource Coordinator in Cedar

Rapids require a rotating shift. "It is not the province of the court to question the legitimate operation of a production facility or determine what is the most productive or efficient shift schedule for a facility." *Rehrs*, 486 F.3d at 358. The rotating shift schedule is applicable to all Resource Coordinators in Cedar Rapids. Therefore, "[s]uch a generally applicable requirement was not discriminatory." *Id.* at 358. Furthermore, Alliant was not required to create a straight day shift for Kallail. *Id.*; *see also Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999) (A company is not "required to create a new position or to create a permanent position out of a temporary one as an accommodation."). Nor, was Alliant required to eliminate an essential function of the Resource Coordinator position to accommodate Kallail. *Rehrs*, 486 F.3d at 359; *see also Fjellestad*, 188 F.3d at 950 ("[A]n employer need not reallocate or eliminate essential functions of a job to accommodate a disabled employee.").

Therefore, because Kallail's restriction to work only an 8-hour day shift schedule rendered her unable to carry out the essential functions of the resource coordinator position, and she did not make a facial showing that a reasonable accommodation was possible, the Court finds that Kallail was not a "qualified individual" under the ADA. Accordingly, Kallail was not protected under the ADA, and Alliant is entitled to summary judgment on Kallail's claim of disability discrimination. *See Peyton*, 561 F.3d at 902 ("As the statutory language indicates, ADA protection extends only to a qualified individual with a disability, namely, 'an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.'") (Quotation omitted).

## VI. ORDER

**IT IS THEREFORE ORDERED AS FOLLOWS**:

1.   The Motion for Summary Judgment (docket number 12) filed by Defendant Alliant Energy Corporate Services, Inc., is hereby **GRANTED**.

2. The Petition (docket number 2) filed by Plaintiff on April 28, 2010, is hereby **DISMISSED**.

3. This case is **CLOSED**.

DATED this ___13th___ day of May, 2011.

_____

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA
